ELLIS, Judge.
This is a suit for damages to a bridge across the Amite River at Clio, Louisiana, when a barge belonging to the defendant and being towed by defendant’s motor boat, the Calla, struck the concrete pillar or foundation under the swinging span at about 2:45 P.M. on February 4, 1947.
The suit was removed to the Federal Court but jurisdiction was refused by the Federal Court and it was sent back to the State Court.
The plaintiff alleged that the barge struck the bridge by reason of the negligent and careless navigation of the Calla when it attempted to tow the barge through the north draw of the bridge, while the defendant denies any negligence on the part of its servants or employees in the operation of. the boat arid further answered that the collision was due to the plaintiff’s failure to comply with the provisions of the permit of the Secretary of War authorizing the construction of the Clio bridge and the applicable provisions *291 of Title 33 of the United States Code in failing to maintain the fender system, as approved by the U. S. engineers.
The answer further alleged that the barge developed an uncontrollable sheer toward the swing span of the bridge as the tug and tow approached and prepared to enter the draw; that the Calla had no alternative but to continue down river through the draw; and that the sheer of the barge took her under the swing span where the forward starboard corner of the rake struck the face of the concrete pivot pier.
In the alternative, defendant pleaded that plaintiff was contributorily negligent in failing to maintain the fender system as required and that this directly contributed to and caused the collision.
Judgment was rendered against defendant and the Calla, in solido, for $1,432.44, with interest and costs, and plaintiff was granted a first lien and privilege on the Calla in that amount. The matter comes before this court on appeal.
It is shown that the Amite River bridge at Clio was constructed in accordance with plans as approved by the U. S. engineers which required a box fender in the middle of the river above, and below the bridge for the purpose of protecting the ends of the middle span of the bridge when it was open for the passage of vessels. It is shown, that the upstream box fender had washed out and had not been replaced at the time of the collision, and defendants strenuously urge that this missing fender caused the pilot to have to navigate the boat too near the northwest bank of the river in trying to go through the draw, and that as the water was shallow near this bank it caused a suction which, together with the high wind and current, caused the barge to sheer so that it came into the draw at an angle and struck the center pier of the bridge.
Plaintiff and defendant cite many Federal cases which are principally concerned with bridges which were deemed to be unlawful structures, however, in the present case there is nothing in. the record to show that this bridge was an unlawful structure. The only thing missing from the bridge at the time of the collision was the upstream box fender which, if charged as negligence to the plaintiff in that it had not been replaced within a reasonable time, it still must be shown that the absence of this fender was the proximate or contributing cause of the accident.
The schooner Calla was a motor vessel 60 feet in length with a beam of 24 feet, and at the time of the collision had a draft of 41/2, feet and was equipped with one 85 Horsepower engine, and was manned by a licensed captain, two deck hands and one engineer. On the date of the accident this boat took a barge loaded with logs in tow at Tiger Bluff on the Amite River, some six miles above the Clio Bridge, bound for the Livingston Sawmill on Blood River. The barge had a length of 135 feet, a beam of 26 feet, and a freeboard of about 1 foot, and her cargo of logs, stowed longitudinally, extended about 2i/2, feet above the deck line at the bow and approximately 5 feet at the highest point at her stern. A short distance above the Clio bridge there is a bend in the river, and the Calla reduced its speed and shortened the bridles and hauser of her tow so that the barge was only some eight or ten feet astern of the vessel, so as to give more control in handling the barge. It is shown that the engine of the Calla was put at dead slow and the tug and tow proceeded thus from 8 to 10 feet off the north bank. It is further shown that a strong north wind of approximately 20 miles per hour had been and was blowing at the time of the accident, and that the current was 2^4, to 3!4 miles per hour. The boat was going south on the river, and as it. neared the open draw the Captain steered away from the north bank and toward the open draw, which' placed the Calla as well as the barge at an angle to the bank and bridge. As the Calla prepared to enter the draw, one of the deck hands was on the port side of the stern of the Calla while the other was on the starboard side, and when the bow was about 8 feet from the bridge, the deck-hand on the starboard side “hollered” to the Captain, and Pilot “to look out, the *292 barge was swinging,” whereupon the deck hand on the portside felt the Calla take a sheer over to the north side. This was done by the pilot in an effort to pull the bow of the barge away from the bridge, however, the maneuver was unsuccessful and' the starboard side of the bow of the barge struck the concrete pillar which is in the center of the swing span, and after it struck, the stern of the barge swung to the south jamming the logs and the barge under the bridge so that the bridge rested on the logs, thereby causing the damage complained of.
The captaip-pilot of the Calla testified repeatedly that had the missing fender been in place at the north end of the swing span he would have gone straight .through the draw bridge and there would have been no accident, directly testifying and also implying that he was afraid to navigate straight through the draw with the missing fender, and, therefore, took the north bank route, and due to the shallowness of the water at that point a suction developed which, together with the wind and current, caused the barge to sheer so as to strike the bridge.
In Vol IS, Corpus Juris Secundum, under the title “Collision,” § 2, page 14, under the subhead “Terms Defined” the following definition is given: “Sheer. A deviation from the line of the course in which a vessel should be steered, which may .occur from causes unpreventable by the most skillful seamanship, but which more frequently happens from an unsteady helmsman.”
We believe that the sheering which the barge took was due to the helmsman and not to any unpreventable cause. The testimony of the bridge tender was to the effect that when the Calla came round the bend the barge was at a 45 degree angle, and he knew then that the barge would not make the draw and that it never did straighten up but came into the draw at an angle. Also from the very testimony of the captain, who was the pilot of the Calla, as well as that of defendant’s other witnesses, that there was a strong north wind blowing and that the Calla proceeded 8 to- 10 feet from the north bank which made it necessary for it to take a diagonal course across the river toward the south bank in order to- get into the north open draw which was the one used for navigation on this bridge, this situation of necessity caused the Calla, up to the point that it turned into the open draw, to be at an angle to the bridge, and placed the barge at an angle to. the open span in which position it was at the time that the bow of the Calla was 8 to 10 feet from the bridge. It was then that it was realized that the -barge was not following the Calla but was swinging or continuing on its course toward the open span of the bridge. The one 85 horsepower engine'of the Calla which had been put at dead slow was unable under the facts and circumstances to change the course of the -barge in time to prevent its striking the bridge.
While it may be true that shallow water causes a suctioi), in the present case the defendant has not proven that such a suction developed as to render the barge uncontrollable and the accident unpreventable, in fact, there is no positive proof that any suction developed. It is shown that the captain had orders to get these logs to the mill; that he had navigated this span with the missing fender for a number of months'without any collision; that on this particular day he knew that a strong wind was blowing from the north as he approached the bridge; he knew that the curr.ent was approximately 2}4, to 3miles per hour, and he chose to navigate the draw rather than to- tie up and wait until conditions were more favorable. He undoubtedly proceeded close to the north bank because of the wind which he knew would have a tendency to blow the heavily loaded barge toward the south, and he hoped that by navigating as the record shows he did rather than proceeding straight through the draw to be able to prevent the wind and current from causing the barge to strike the bridge. In other words, he was guarding against the possibility of this strong wind and the current causing a collision by pursuing the course he did, and had he been able to change the course in which the barge was traveling by reason of the direction in which he *293 towed it when approaching the open draw the collision would have been prevented, however, it is in evidence that the captain was unable to change the course of the barge. Either the captain was negligent in waiting too long to attempt to change the course of the barge' or, if 'he acted in time, the 85 H.P. engine on the Calla did not have enough power, considering the wind and the current, of which the captain was or should have been well aware, to change the course of the barge and prevent the collision. The captain testified as follows:
“Q. You say you went to the north' •bank because there was no fender, but if there had been a fender, you would have gone straight through? A. Yes.
“Q. Suppose there had been one there and you went in straight, what would have happened ? A. If the fender had been there and the wind would not have been blowing so hard, I would have gone on through there, but the wind was blowing so 'hard, that is why I hit the bridge.
“Q. Why couldn’t you go through there straight without the fender ? A. The wind would not let me go.”
The captain, fully aware of the power of the Calla, the load which he was towing, the weather conditions, and the current, knew that there was danger of a collision but apparently thought that he could navigate the draw by proceeding as he did. He could have tied up and waited until conditions were favorable, but when he chose to proceed with full knowledge of the danger and the collision occurred as a result of one of the dangerous forces of which he was aware, then the defendants are liable. When the barge came to rest under the bridge, the closest contact distance between the two to the end of the bridge was at least 12 feet, therefore, had the fender been in place it would not have been touched in the collision and unless it can be concluded that had the missing fender been in place the captain would have tried to navigate straight through the bridge rather than as he did, then any negligence on the part of the plaintiff in not having the fender in place would definitely not be a contributing or proximate cause of this collision. The facts as shown by, this record definitely lead to but one conclusion as to why the captain navigated along close to the north bank and then proceeded at an angle in order to navigate through the north draw of the bridge and that was because of the strong wind, current, and tide, as he testified.
We believe that this collision was due to faulty navigation and therefore the judgment of the district court is affirmed.